# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 11, 2014

## STATE OF TENNESSEE v. JEWELL WAYNE SMITH, JR.

**Appeal from the Circuit Court of Robertson County**
**No. 2011-CR-690     Michael R. Jones, Judge**

---

**No. M2013-01573-CCA-R3-CD - Filed February 20, 2014**

---

Jewell Wayne Smith, Jr. ("the Defendant") entered a best interest plea to voluntary manslaughter. Following a sentencing hearing, the trial court sentenced the Defendant to thirteen years' incarceration. The trial court ordered this sentence to run consecutively to a sentence the Defendant received for a probation violation. On appeal, the Defendant argues that the length of his sentence in this case is excessive. After a thorough review of the record and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Gregory D. Smith (on appeal) and Chris Clark (at plea submission and sentencing), Clarksville, Tennessee, for the appellant, Jewell Wayne Smith, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Michelle L. Consiglio-Young, Assistant Attorney General; John W. Carney, District Attorney General; and Jason White, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Defendant was indicted on November 16, 2011, on one count of first degree premeditated murder. This indictment arose from an incident occurring on August 14, 2011. The Defendant subsequently entered a best interest plea to voluntary manslaughter. At the Defendant's plea submission hearing, the State recited this factual basis for the plea:

The facts would show, Your Honor, the date of the homicide, prior to that, the victim and the defendant had once been friends, but had developed a disagreement over some money and the night of the homicide that occurred on Blair Street, about 2005 Blair, about an hour or so before that homicide, the victim – the defendant pulled up in a green, I believe a Pontiac and got out and then probably thirty minutes or so, twenty minutes or so before the homicide, and Martel (phonetic) Black would say to him and the defendant and another person, Terrence Bigby, were in a car smoking marijuana when . . . the victim came by on his bicycle and bumped the car, would say at that time that [the victim] went on down the street. The Defendant got out of the car and had a weapon in his hand, he would describe it as a Smith and Wesson, .40 caliber and that [the Defendant] made some comments about the victim and then at that time, Mr. Black would say that he called the victim multiple times to warn him about [the Defendant] and this is corroborated by phone records, what the conversation is about . . . .

The proof would show that the victim had went [sic] to April Davis' house to see, to sit for phone calls and finally picked up on[ ]the last one and after talking, left to head back down the street to 2005 Blair. Ms. Davis will say that when he came in, he took a gun out and put it on the dresser drawers and when he left, he picked that gun back up, that being the victim.

The corroboration of witnesses would then say, Your Honor, that the victim came down on his bicycle, got off his bicycle at 2005 Blair, it's a housing authority duplex. There's a tree there and would say that the – a couple of witnesses would say at that time that [the Defendant] was kind of behind the tree, kind of in a dark area and that the victim got out and could tell a conversation occurred and that shortly thereafter, a ray [sic] of gunfire, describe anywhere between four to six, seven – one even told me seven shots. Everybody described the gunfire going in one direction from the defendant to the victim. Nobody sees any gunfire coming back the other way and describes the victim is shot multiple times and from there – does not die immediately, Your Honor, gets up and goes down the street and waves for help. At that time, the Defendant . . . flees the scene.

. . . We have several – a few witnesses that would put it there, say they saw the gunfire, but say they didn't see [the Defendant] actually do the shooting. One witness in TDOC has got an aggravated conviction since this, that would be the only eyeball witness that we would have. [The Defendant] gave a statement, Your Honor, that if he testified, would say that the victim,

-2-

he did shoot one time but that was only because the victim pulled the gun on him first. Would have a witness say that he did – the police weren't sure where the crime scene occurred so it took them – because the victim had fled down the street, by the time they got up to the crime scene, most everything had been picked up. Out of all six shots, no shell casings – only one bullet found. No guns found. Would have one witness to say that he did pick up a gun, may or may not be the victim's gun . . . . So there is not a lot of physical evidence at the scene because the crime scene had been cleared or cleaned up before the police realized where the crime scene was. That would be the facts, Your Honor, to show – we do have an eyeball witness that would say the Defendant shot him. Other witnesses that would corroborate that. Due to the circumstances of witnesses' impeachment and not sure exactly what everyone is going to say on the stand – we even had one at the prelim to charge her story.

As part of the plea agreement, the Defendant agreed to be sentenced by the trial court in the range of ten to fifteen years, which is a Range III sentence, see Tenn. Code Ann. § 40-34-112(c)(3) (2010), but in all other respects to be sentenced as a Range II offender. The Defendant had two probation violations, resulting in sentences of four years each to be served consecutively. The trial court also was to determine at the sentencing hearing whether the Defendant's sentence for his voluntary manslaughter conviction would be served concurrently or consecutively to the latter, previously imposed sentence for a probation violation.

At the sentencing hearing, the presentence report was admitted as an exhibit, and it is included in the record before us. Cory Robertson testified that the victim was her son and that he was approximately twenty years old at the time of his death. Although the victim did not live with Robertson at the time of his death, she saw him "every other day" and "had a wonderful relationship with him." On the day of the victim's death, Robertson received a phone call to go to the hospital. When she arrived at the hospital, the victim was in surgery. Eventually, Robertson learned that the victim had passed away. She knew the victim and the Defendant as friends and did not understand why the Defendant would kill the victim. Robertson stated that she had attended counseling but that the counseling ended when she began her job.

Sally Watson Hernandez testified that, on the night the victim was killed, she was living at 2003 Blair Street, which is next door to the home where the victim was shot. When the incident occurred, Hernandez was across the street talking to Katrina Johnson on the front porch. She had observed the Defendant go by the house (2005 Blair Street) earlier in the day, and she also had observed the victim ride his bicycle to the house shortly before he was shot.

-3-

Shortly after the victim parked his bicycle, "there was fire . . . from a gun," which prompted Hernandez to run inside the house. Hernandez confirmed that she saw the "fire" and stated that it was going toward the tree where the victim had parked his bicycle. She described the sound of the shots as "[o]ne after another" and did not see gunshots being fired in a different direction. At some point, Hernandez returned outside the house and observed the victim "in the road dripping with blood."

On cross-examination, Hernandez stated that she believed the victim was somewhat intoxicated. She confirmed that the gunshots she observed did not come from the tree where the bicycle was parked.

Montell Black stated that he currently was on community corrections for theft. He confirmed that he was with the Defendant and an individual who went by "T" on the night the victim was shot. According to Black, they were sitting in a vehicle outside the residence at 2005 Blair Street. He denied having any knowledge that the Defendant and the victim were having any sort of dispute. At some point, the victim approached on his bicycle and bumped the vehicle in which Black, Robertson, and T were sitting. Immediately, the Defendant "[j]ust jumped out."

According to Black, the Defendant walked under a tree, and Black walked away from the area. He called the victim's cell phone because Black had seen a gun in the Defendant's possession. Black believed the gun was a "40 Smith and Wesson." When the victim answered, Black told the victim, "I think [the Defendant is] fixing to do something to you; I don't know." The victim met up with Black, "and then [the victim] took off." Approximately five minutes later, Black heard shooting.

When Black returned to the scene, he saw that the victim had been shot and "was bleeding out." The victim did not say who shot him, and Black did not see the Defendant at the scene at that time. On cross-examination, Black stated that he only saw approximately two and one-half inches of the gun sticking out of the Defendant's clothes, so he only was guessing as to the type of gun. He denied seeing more than the one gun on the Defendant. Black heard six gunshots and recalled that one shot came first, and then the others fired in rapid succession.

Peggy Stanton, the Defendant's grandmother, testified that, at approximately 10:00 p.m. on the night of this incident, the Defendant knocked on her back door. She had been asleep and was not expecting the Defendant. Stanton testified, "He said Granny. I said what is it, baby? He said somebody's after me. I said well, what's the matter? He said they trying [sic] to kill me." The Defendant explained to her that the victim, with his bicycle, hit the vehicle in which the Defendant was sitting. The victim drove away, returned, and then

pulled out a gun. At that point, the Defendant "took off running" to her house, which was approximately a block or two away.

Stanton confirmed that she would assist the Defendant once he was released from jail and that she had a good relationship with him. On cross-examination, Stanton acknowledged that she did not call the police to inform them of the Defendant's whereabouts.

Tanya Farmer, the Defendant's sister, testified that, to her understanding, the Defendant and the victim were friends. On the day of the incident, Farmer saw the victim at approximately 10:00 a.m. at her friend's apartment. The victim was looking for the Defendant and asked Farmer where he was, but Farmer stated that she did not know. In Farmer's opinion, the victim seemed angry.

Martize Leavell testified that he saw the victim at Southfield Apartments on the day of the shooting. The victim told Leavell that he was at the apartments because "he was waiting on [the Defendant]." Leavell confirmed that the victim appeared to be "under the influence" and seemed "like he wanted to be left alone."

Natasha Dowlen, the Defendant's fiancée, testified that she planned to marry the Defendant upon his release from incarceration. She had two children, one of whom was the Defendant's daughter who was born after the Defendant became incarcerated. Her other child was not the Defendant's son, but the Defendant treated him as his own son and helped provide for him.

Laucja Mason, the Defendant's mother, testified that the Defendant made good grades in school until the twelfth grade. At that time, "[h]e got to hanging with some more friends, they was [sic] skipping school, and he was underage." Mason continued, "I had to go to court for him missing so many days at school, and he just dropped out." While in school, the Defendant had played basketball and football and worked at Hardee's. The Defendant began working at Electrolux while in school and continued working there for nine months after he dropped out. Mason knew the victim and believed that he and the Defendant were good friends. Besides the Defendant skipping school, Mason never had any behavioral issues with the Defendant. In her opinion, he was polite and respectful.

On cross-examination, Mason acknowledged that the Defendant was on probation at the time the victim was killed. She stated that she primarily was responsible for taking the Defendant to and from meetings with the probation officer.

The Defendant testified that he and the victim were friends. Prior to the night the victim was killed, both the Defendant and the victim had been incarcerated, and the victim

had been released from incarceration approximately one month before the Defendant's release. When both were released, they "started back hanging around each other."

The Defendant testified that, on the night the victim was killed, the victim, on his bicycle, approached the Defendant. The Defendant and another individual, Joe Larry, were standing by a tree in the yard of 2005 Blair Street. The victim said to the Defendant, "[M]an, been hearing something. . . . I hope it ain't [sic] even true." The Defendant responded, "[W]hat you talking about?" and the victim pulled out a pistol. The Defendant continued,

> And then when he pulled it out I hit his hand, he shot. Then I started running back, he shot again, that's when I fell in front of Demarius['] porch right there, that's when I pulled out the gun and shot. The gun jammed up. So as I was getting up on the side of the house somebody else started shooting.

The Defendant explained that the shots were coming from the alley between 2005 and 2007 Blair Street.

The Defendant testified that the victim was taller than him, and yet he recalled from the medical examiner's report that the shots on the victim were traveling downward. He confirmed that he provided the gun in his possession to police – a Llama .45 caliber. According to the Defendant, if he were given probation he would "straighten [his] life up. [He]'d get married, and get [a] job, and be the father and man [he] need[s] to be."

On cross-examination, the Defendant agreed that he was on probation at the time of the victim's death. The underlying convictions for which he was on probation were facilitation of aggravated assault and a drug offense. The Defendant had been charged in the drug offense while out on bond for the aggravated assault offense. During this time, the Defendant did not have a job, so he, the victim, and Demarius Smith made money by "hustling drugs." When they were released from incarceration, Demarius owed the victim "some weed and some money."

The Defendant acknowledged that, despite the fact that he proclaimed his innocence in this case, he did not turn himself in to police until approximately six weeks after the night of the incident.

Detective Terry Dorris testified that he and another officer, Agent Rigsby, investigated the scene the day after the incident and could not find any shell casings. He stated that he only found a .40 caliber bullet, which could not have been fired from the Defendant's gun. He confirmed that the medical examiner's report indicated that all of the gunshots had gone through the victim's body completely such that it was impossible to determine the type of

bullets fired into the victim's body.  Detective Dorris could find no markings or bullet holes at the scene to corroborate the Defendant's story of the victim's shooting at him.

At the conclusion of the proof at the sentencing hearing, the trial court considered as mitigation that the Defendant entered a plea, that he had worked, and that he had a child.  See Tenn. Code Ann. § 40-35-113(13) (2010).  The trial court found that no other mitigating factors applied.  With regard to enhancement factors, the trial court noted that, given that it was sentencing the Defendant as a Range III offender, it was not considering the Defendant's five prior felony convictions.  However, the trial court did consider the Defendant's prior misdemeanor conviction to apply the first statutory enhancement factor  See id. § 40-35-114(1) (2010). Additionally, the trial court found that the Defendant possessed a firearm in the commission of this offense.  See id. § -114(9).  The trial court also found that the Defendant was on probation at time the offense was committed.  Id. § -114(13).

Accordingly, the trial court sentenced the Defendant to thirteen years' incarceration.  The trial court ordered this sentence to run consecutively to the Defendant's sentence for his second probation violation.[1]  The Defendant timely appealed his sentence, arguing that the length of his sentence is improper.

## Analysis

Prior to imposing sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections ] 40-35-113 and 40-35-114;

---

[1] As stated previously, the sentence for the Defendant's second probation violation already was to be served consecutively to the sentence for the Defendant's first probation violation.  These sentences were four years each.

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010).

The referenced "principles of sentencing" include the following: "the imposition of a sentence justly deserved in relation to the seriousness of the offense" and "[e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs." Tenn. Code Ann. § 40-35-102(1), (3)(C) (2010). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(4), (5) (2010).

Our Sentencing Act also mandates as follows:

In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Id. at 709.

This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

The Defendant argues on appeal that the length of his sentence is excessive. Specifically, the Defendant contends that the trial court erred in its application of the first statutory enhancement factor – that the Defendant had a previous history of criminal activity. See Tenn. Code Ann. § 40-35-114(1).

In this case, the Defendant pleaded guilty to voluntary manslaughter, a Class C felony, which carries a sentence of ten to fifteen years for a Range III offender. See Tenn. Code Ann. §§ 39-13-211(2006); 40-35-112(c)(3) (2010). Therefore, the trial court's sentence of thirteen years is within the authorized term for a Class C felony.

At the sentencing hearing, the trial court considered as mitigation that the Defendant entered a plea, that he had worked, and that he had a child. See Tenn. Code Ann. § 40-35-113(13). The trial court found that no other mitigating factors applied. The trial court then determined that the first, ninth, and thirteenth statutory enhancement factors were applicable in this case. See Tenn. Code Ann. § 40-35-114(1), (9), (13) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; "The defendant possessed or employed a firearm . . . during the commission of the offense"; and "At the time the felony was committed, one (1) of the following classifications was applicable to the defendant: . . . (C) Released on probation[] . . . .").

The trial court's findings as to these enhancement factors are supported by the record. The trial court was to sentence the Defendant within Range III with respect to the length of the Defendant's sentence. As applicable in this case, one way to establish a defendant as a Range III offender is if the defendant has "[a]ny combination of five (5) or more prior felony convictions within the conviction class or higher or within the next two (2) lower felony classes." Tenn. Code Ann. § 40-35-107(a)(1) (2010). A review of the record in this case confirms that the Defendant had at least five prior felony convictions. Additionally, the Defendant had a prior misdemeanor conviction, which is sufficient "criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." Id. § 40-35-114(1). Thus, the trial court did not err in its application of this factor.

Moreover, the record established, by the Defendant's own admission at the sentencing hearing, that the Defendant employed a firearm during the commission of this crime. See id. § -114(9). Furthermore, the Defendant also admitted at the sentencing hearing that he was on probation at the time of this offense. See id. § -114(13). Therefore, the trial court did not err in its application of the statutory enhancement factors in this case.

In summary, we hold that the trial court imposed this sentence in a manner consistent with the purposes, principles, and goals of the Sentencing Act. Accordingly, the Defendant is entitled to no relief.

**CONCLUSION**

For the reasons set forth above, we affirm the judgment of the trial court.

_____
JEFFREY S. BIVINS, JUDGE